IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | SUPERSEDING |
| | : | |
| v. | : | |
| | : | |
| DOUGLAS ALAN CORRIHER | : | 1:16CR205-1 |
| SHANNON MICHELLE DRAKE | : | 1:16CR205-2 |
| RONALD KEITH EARNEST | : | 1:16CR205-3 |

The Grand Jury charges:

## COUNT ONE

### INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.  DOUGLAS ALAN CORRIHER was a resident of Greenwood, South Carolina.

2.  A bank hereafter referred to as SC Bank was a bank and financial institution chartered under the laws of the State of South Carolina with its headquarters in Greenville, South Carolina.  SC Bank is governed by a board of directors.  The deposits of SC Bank were insured by the Federal Deposit Insurance Corporation.

3.  DOUGLAS ALAN CORRIHER was employed as an officer and vice president of SC Bank in Greenville, South Carolina.

4.  SHANNON MICHELLE DRAKE was a resident of Williamston, South Carolina.

5.  SHANNON MICHELLE DRAKE was employed at SC Bank in Greenville, South Carolina.

6.  RONALD KEITH EARNEST was a resident of Simpsonville, South Carolina.

7.  RONALD KEITH EARNEST was employed as an officer and president of SC Bank in Greenville, South Carolina.

8.  An individual whose initials are B.G.H. was a resident of Greensboro, North Carolina.

9.  B.G.H. operated staffing businesses in Guilford County, North Carolina, through three corporations incorporated under the laws of the State of Delaware: Compensation Management, Inc. ("CMI"), Compensation Management of Iowa, Inc. ("CMI of Iowa"), and I.H.T. of SC, Inc. (collectively, "the Staffing Companies"). The Staffing Companies were incorporated at B.G.H.'s direction.

10.  B.G.H. was the *de facto* owner of the Staffing Companies despite his designation of nominee owners. B.G.H. controlled the operations of the Staffing Companies, including the funding of payroll to employees and all major financial or banking transactions.

11.  The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury. The IRS has the responsibility to administer the internal revenue laws of the

2

United States, including the ascertainment, computation, assessment, and collection of income and other taxes.

12. The Staffing Companies together employed thousands of workers who performed unskilled labor for client companies. These employees were on the payroll of the Staffing Companies.

13. The Staffing Companies contracted with client businesses to provide temporary workers at the location of the client businesses and promised, among other things, to assume full responsibility for payment of wages to the temporary employees and to withhold and transmit taxes for the temporary employees.

14. The Staffing Companies withheld taxes from employees' paychecks, including federal income taxes, Medicare, and Social Security taxes (often referred to as Federal Insurance Contribution Act taxes or "FICA" taxes). These taxes will be referred to collectively in this Indictment as "payroll taxes."

15. IRS Form 941, Employer's Quarterly Federal Tax Return ("Form 941"), was the form used by employers to report to the IRS the employers' withholding of income taxes, Social Security taxes, and Medicare taxes from employees' paychecks, and to report to the IRS the employers' payment of the employers' portion of Social Security and Medicare taxes.

3

16. Global Labor, Inc. ("Global Labor") was a corporation organized under the laws of the State of Delaware and was operated by B.G.H.

## FDIC AND BANKING REGULATION

17. The Federal Deposit Insurance Corporation ("FDIC") was an independent agency of the government of the United States that guaranteed the deposits of customers in all insured United States depository institutions up to $250,000.00.

18. The FDIC regulated those banks insured by FDIC but not supervised by other federal regulators to promote safe and sound banking practices for the purposes of insuring deposits against bank failures and maintaining stability and public confidence in the nation's banking system.

19. The Legal Lending Limit ("LLL") was a regulatory function that restricted the amount of money that a bank could lend to a single individual, corporation, or guarantor, to prevent undue risk to the bank's capital reserves.

20. To promote the financial safety and soundness of insured banks, the FDIC calculated an LLL that capped the amount that a bank could lend to an individual borrower or guarantor. For state-chartered banks, the banking commission of the chartering state calculated and imposed lending limits. Banks also calculated

4

their own internal lending limits that were used by bank loan officers to govern lending activity.

21.    The FDIC conducted examinations of state-chartered, FDIC-insured banks to ensure that such banks were operating within state-imposed LLLs.

22.    To ensure that banks were employing safe and sound banking practices and complying with banking regulations, including LLL, the FDIC and state banking authorities conducted routine and periodic examinations of FDIC-insured banks.

23.    In conducting these examinations, FDIC examiners reviewed the books and records of the insured bank. FDIC examiners relied on the completeness and accuracy of the books and records of the insured bank to determine whether the insured bank was financially safe and sound and operating within FDIC regulations and state banking regulations.

24.    The South Carolina State Board of Financial Institutions ("BOFI") was the state regulatory agency for banks chartered in the State of South Carolina. BOFI's mission was to serve the citizens of South Carolina by protecting the borrowing public and ensuring that state-chartered banks followed the laws and regulations established by the state.

5

25. To ensure that banks were employing safe and sound banking practices, BOFI imposed certain regulations, including LLL, on state-chartered banks.

26. BOFI conducted routine and periodic examinations of banks chartered in South Carolina to ensure that such banks were complying with state-imposed regulations, including LLL.

27. In conducting these examinations, the examiners of BOFI reviewed the books and records of the state-chartered banks. Examiners of BOFI relied on the completeness and accuracy of the books and records of South Carolina state-chartered banks to determine whether the bank was financially safe and sound and operating within regulations imposed by BOFI, including LLL.

28. The practice of nominee lending is one in which a bank makes loans to a nominal borrower for the benefit of a concealed third party not included in the loan agreements. Nominee lending is not a sound banking practice, as it could result in the creation of false entries on the bank's books, could violate bank policies on obtaining security interests in collateral, and could violate lending limits imposed on the bank.

29. The deposits of SC Bank were insured by the FDIC, and SC Bank was subject to examination of its books and financial records by FDIC examiners.

6

30.  SC Bank, as a bank chartered under the laws of the State of South Carolina, was subject to regulation and examination by examiners of the BOFI.

31.  SC Bank, as a bank chartered under the laws of the State of South Carolina, was subject to lending limits imposed by the BOFI.

32.  As a matter of bank policy, SC Bank maintained internal lending limits binding on the bank and its officers for the purpose of protecting the financial interests of the bank.

33.  SC Bank provided both commercial and consumer loan services to customers in the region of North and South Carolina, including financing based upon borrower receivables known as factoring.

34.  Factoring of receivables is a form of commercial lending in which credit is extended to a borrower based on the amount due and payable to the borrower on its customer accounts receivable. In a factoring lending arrangement, the lending bank advances funds or credits to the borrower in some percentage of the amount of the receivables.  The lending bank then receives payment directly from the customers of the borrower.

35.  In most factoring of receivables arrangements, the lending bank does not advance the full face amount of the receivables to the borrower, but only advances money or credit in

7

a percentage of the borrower's invoices as agreed in a formal factoring agreement. Upon payment to the lending bank by the borrower's customers on the invoices, the lending bank then remits the remaining funds to the borrower minus interest or fees as provided for by the factoring agreement.

36. In factoring agreements, the lending bank normally requires that the borrower provide the lending bank with a first security position on its receivables to serve as collateral on the factoring agreement. Such a first security agreement allows the lending bank to attempt to recoup its losses if the borrower defaults on the factoring agreement.

37. SC Bank maintained and operated a factoring department dedicated to providing and servicing factoring lines of credit to clients of SC Bank. DOUGLAS ALAN CORRIHER was the vice president in charge of the factoring department at SC Bank.

38. SHANNON MICHELLE DRAKE worked at SC Bank in the factoring department under the direct supervision of DOUGLAS ALAN CORRIHER.

39. RONALD KEITH EARNEST served as the president of SC Bank under the direction of the SC Bank Board of Directors. Among other duties, which included the supervision of SC Bank officers and employees (including DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE), RONALD KEITH EARNEST prepared and presented loan

8

memoranda to the SC Bank Board of Directors seeking board approval of proposed loans.

40.  SC Bank entered into written factoring agreements with its factoring customers. SC Bank did not provide factoring lines of credit as its normal business practice without a written factoring agreement between SC Bank and the factoring customer.

41.  The written factoring agreements typically identified specific collateral, including accounts receivable, to be provided to SC Bank to serve as security for any factoring advances under the factoring agreements.

42.  The written factoring agreements also typically stated the commitment amount that could be advanced to the factoring customer.

43.  SC Bank required that the factoring client provide SC Bank with a first or senior lien position on the collateral, including accounts receivable.  SC Bank then filed UCC-1 forms with the relevant state's office of the Secretary of State, thereby giving notice of SC Bank's first lien position.

44.  SC Bank officers were required by SC Bank policy to conduct a due diligence review of the financial condition of the factoring customer, including whether SC Bank would be able to obtain a first lien position on the assets of the factoring

9

customer, to provide security to SC Bank for the factoring agreement.

45. It was a standard practice of SC Bank's factoring department to monitor the tax compliance of factoring clients of SC Bank. Non-payment of taxes by a SC Bank factoring client put SC Bank at increased risk of loss, as the government that is owed the taxes could claim a superior security interest in the assets of the factoring client, thereby allowing the government to be paid prior to SC Bank by a factoring customer.

46. It was the duty of any SC Bank officer or employee to report to SC Bank that a factoring client was not complying with its tax obligations.

47. SC Bank used two structures for factoring lines of credit: an invoice-specific structure and a factoring pool. In a factoring pool, advances were made to the factoring client based on the sum of the borrower's invoices minus invoices over ninety days past due, any invoices otherwise deemed ineligible by SC Bank, and amounts over the credit limit. This sum could then be advanced at a rate set forth in the factoring agreement.

48. Advances were governed by a maximum advance ratio of qualified invoices that were held in a pool. All payments received by the bank from the payment of invoices were applied to the

10

balance of advances, and accrued fees were billed to the factoring customer on a monthly basis.

B.G.H. AND SC BANK

49.  In or around 2003, the exact date to the Grand Jurors unknown, DOUGLAS ALAN CORRIHER approached B.G.H. and unsuccessfully solicited B.G.H. to factor with SC Bank the receivables of the staffing businesses he was then operating. SC Bank could not loan as much money as B.G.H. wanted due to the lending limits applicable to SC Bank.

50.  In or around 2004, the exact date to the Grand Jurors unknown, B.G.H. approached DOUGLAS ALAN CORRIHER and told him that B.G.H. was then operating a single company that provided "back office" services, such as payroll processing, for regional staffing companies that had entered into licensing agreements with B.G.H. ("the Regional Staffing Companies").

51.  Each of the Regional Staffing Companies was owned and controlled by B.G.H. through nominee owners and officers who had no actual control over the operations of the Regional Staffing Companies.  The Regional Staffing Companies included, among others, US Staffing of Florida, Inc., US Staffing of North Carolina, Inc., and US Staffing of South Carolina, Inc.

52.  SC Bank entered into separate factoring agreements with the Regional Staffing Companies, including among others, US

11

Staffing of North Carolina, Inc., and US Staffing of South
Carolina, Inc.

53. On or about November 30, 2006, B.G.H. sold the Regional
Staffing Companies to former employees who operated the staffing
business through their company, hereafter referred to as Company
S.

54. Following the sale of the Regional Staffing Companies,
SC Bank discovered that B.G.H. had owned and controlled the
Regional Staffing Companies. SC Bank imposed liability on B.G.H.
personally for remaining unpaid factoring advances owed by the
Regional Staffing Companies after B.G.H. sold the Regional
Staffing Companies.

55. SC Bank thereafter advanced other funds to B.G.H. as
personal loans based on B.G.H.'s representations that B.G.H. would
re-acquire the staffing businesses and enter into new factoring
agreements with SC Bank.

56. By 2008, SC Bank had advanced B.G.H. over $1,000,000.00
in personal loans.

57. CMI was incorporated at B.G.H.'s direction. On or
around August 15, 2008, B.G.H., through CMI, re-acquired the
staffing businesses through a Purchase and Sale Agreement with
Company S.

12

58.   J.M., an individual known to the Grand Jurors, was a resident of Greensboro, North Carolina.   J.M. served as a pilot for B.G.H.'s personal airplane.

59.   J.M. had previously served as a straw owner and operator of one of the Regional Staffing Companies.   J.M. did not actually conduct any staffing business.

60.   Medaloni, Inc., was a corporation organized under the laws of the State of North Carolina and was in the business of operating bars and nightclubs in Greensboro, North Carolina. Medaloni, Inc., was operated by J.M. and did not conduct any staffing business.

61.   M.M., an individual known to the Grand Jurors, was a resident of Greensboro, North Carolina, and was employed in the nightclub business as a disc jockey and entertainer under the name "D.J. Spinny."   M.M. previously served as a straw owner and operator of one of the Regional Staffing Companies, US Staffing of Georgia, Inc.   M.M. did not work in the staffing industry.

62.   Medaloni of SC, Inc., was a corporation organized under the laws of the State of South Carolina in or around July 2008, at the direction of B.G.H. for the purpose of entering into nominee factoring lines of credit with SC Bank under the false pretense that it was an active staffing company.   M.M. was the straw owner

13

of Medaloni of SC, Inc., which in fact had no staffing business and no employees.

63. R.H., an individual known to the Grand Jurors, was an associate of B.G.H. R.H. previously served as the straw owner of US Staffing of Virginia, Inc., one of the Regional Staffing Companies.

64. Green Ideas N Motion Corporation was a corporation organized under the laws of the State of North Carolina by R.H. for the purpose of selling environmentally safe products on the internet. Green Ideas N Motion Corporation did not conduct any staffing business.

65. M.B., an individual known to the Grand Jurors, was a citizen of the United Kingdom who resided in Greensboro, North Carolina. M.B. had previously served as the straw owner of US Staffing of North Carolina, Inc., one of the Regional Staffing Companies. M.B. was employed by B.G.H. as an assistant and played soccer with B.G.H.

66. Brooks Labor, Inc., was a corporation organized under the laws of the State of North Carolina in or around July 2008 at the direction of B.G.H. for the purpose of entering into nominee factoring lines of credit with SC Bank under the false pretense that it was an active staffing company when, in fact, it had no such business and no employees.

14

67. M.G., an individual known to the Grand Jurors, was a resident of Greensboro, North Carolina. M.G. previously served as the straw owner of US Staffing of South Carolina, Inc., one of the Regional Staffing Companies.

68. NC Global Investments, Inc., was a corporation organized under the laws of the State of North Carolina in or about July 2008 at the direction of B.G.H. for the purpose of entering into nominee factoring lines of credit with SC Bank under the false pretense that it was an active staffing company when, in fact, it had no such business and no employees.

69. E.B., and individual known to the Grand Jurors, was an associate of B.G.H. E.B. previously served as a straw owner of US Staffing of Tennessee, Inc., one of the Regional Staffing Companies.

70. I.H.T. of SC, Inc., was a corporation organized under the laws of the State of Delaware in or around February 2009 at the direction of B.G.H. Although E.B. was the purported owner of I.H.T. of SC, Inc., B.G.H. controlled the operations, including the funding of payroll.

## CONSPIRACY

71. From in or around July 2008, continuing up to and including in or around May 2013, the exact date to the Grand Jurors unknown, in the Middle District of North Carolina, and elsewhere,

15

DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, B.G.H., and divers other persons, both known and unknown to the Grand Jurors, knowingly and unlawfully combined and agreed together and with other persons:

     a.    To defraud the United States of America concerning one or more of its lawful government functions by impeding, impairing and obstructing the lawful governmental function of the FDIC to insure deposits and examine and supervise banks for operational safety and soundness;

     b.    Then being employees of SC Bank, to willfully embezzle and misapply the money, funds and credits of SC Bank, a bank whose deposits were then insured by the FDIC, with intent to injure and defraud SC Bank, of a value of more than $1,000.00., in violation of Title 18, United States Code, Section 656; and

     c.    To make and cause to be made materially false entries in the books, reports, and statements of SC Bank, a bank whose deposits were then insured by the FDIC, with intent to deceive the officers and directors of SC Bank, the FDIC, and the agents and examiners appointed to examine the affairs of SC Bank, in violation of Title 18, United States Code, Section 1005.

MANNERS AND MEANS

    72.   It was a part of the conspiracy that DOUGLAS ALAN CORRIHER, on behalf of SC Bank and B.G.H., would and did enter

16

into factoring agreements with Medaloni, Inc., Medaloni of SC, Inc., Green Ideas N Motion Corporation, Brooks Labor, Inc., and NC Global Investments, Inc. (the "Nominee Companies") under the false pretense that SC Bank would be factoring the receivables of the Nominee Companies when, in fact, the Nominee Companies did no staffing business, had no actual receivables, and the invoices being factored belonged to CMI.

73. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, and B.G.H. would and did factor receivables of the Staffing Companies through SC Bank in amounts over the lending limits imposed on SC Bank by the BOFI and internal bank policy.

74. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, and B.G.H. would and did factor receivables of the Staffing Companies through the accounts of the Nominee Companies at SC Bank despite the fact that the receivables of CMI were subject to liens in favor of creditors who would hold a superior lien position to SC Bank.

75. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, and B.G.H. would and did factor receivables of the Staffing Companies through the accounts of the Nominee Companies at SC Bank despite the fact that B.G.H. was also personally liable to SC Bank for

17

over $1,000,000.00, an amount which, when combined with the credit extended to the Nominee Companies, placed B.G.H. even further over the LLL that SC Bank could extend to B.G.H.

76. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, and B.G.H. would and did advance funds factored on the receivables of the Staffing Companies through the accounts of the Nominee Companies at SC Bank despite the fact that B.G.H. was not paying payroll taxes due to the IRS for the Staffing Companies.

77. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, RONALD KEITH EARNEST, and B.G.H. would and did cause the Nominee Companies to secure the factoring agreements with purported first lien positions in their receivables when the Nominee Companies had no actual receivables and the supposed first lien position granted SC Bank was false.

78. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST would and did cause the factoring agreements with the Nominee Companies to be entered into the books and records of SC Bank as if the Nominee Companies actually had receivables that could be factored when, in fact, the receivables at issue were actually the Staffing Companies' receivables.

18

79. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST would and did create false accountings on the books and records of SC Bank in order to advance funds to and for the benefit of B.G.H. over and above lending limits imposed on SC Bank by the BOFI and by SC Bank policy.

80. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST would and did make factoring advances to Global Labor, a company which was controlled by B.G.H., under the pretense that these funds were factoring advances on the receivables of the Nominee Companies when they were actually factoring advances on the receivables of the Staffing Companies.

81. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST would and did advance funds through the accounts of the Nominee Companies to Global Labor and B.G.H. to circumvent the lending limits imposed on SC Bank by BOFI and by SC Bank internal policy.

82. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, and B.G.H. would and did perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

19

## OVERT ACTS

83.   In furtherance of the conspiracy and to effect the objects thereof, DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, B.G.H., and divers others, both known and unknown to the Grand Jurors, committed and caused to be committed overt acts in the Middle District of North Carolina, and elsewhere, including, but not limited to, the following:

84.   On or about July 25, 2008, DOUGLAS ALAN CORRIHER caused to be submitted commercial loan memoranda falsely representing that the Nominee Companies were staffing companies with substantial staffing business, clients, and receivables, when, in fact, as DOUGLAS ALAN CORRIHER then well knew, the Nominee Companies had no real staffing business and the receivables to be factored belonged to CMI.

85.   On or about July 29, 2008, DOUGLAS ALAN CORRIHER travelled from Greenville, South Carolina, to the personal residence of B.G.H. in Greensboro, North Carolina, in the Middle District of North Carolina, for the purpose of executing the factoring agreements with the Nominee Companies.

86.   On or about July 29, 2008, DOUGLAS ALAN CORRIHER met with B.G.H., J.M., M.M., R.H., M.B., and M.G. at B.G.H.'s personal residence in Greensboro, North Carolina, in the Middle District of North Carolina.  DOUGLAS ALAN CORRIHER presented J.M., M.M., R.H.,

20

M.B., and M.G. with factoring agreements between each of the Nominee Companies and SC Bank. At the direction of DOUGLAS ALAN CORRIHER and B.G.H., each executed the factoring agreement.

87. On or about July 29, 2008, J.M., M.M., R.H., M.B., and M.G. each executed a form at the direction of DOUGLAS ALAN CORRIHER and B.G.H. authorizing SC Bank to wire advances on the factoring lines of credit the Nominee Companies to Global Labor under the pretense that Global Labor was a licenser of the Nominee Companies providing services such as payroll to the nominee company.

88. From on or about December 19, 2008, continuing up to and including on or about December 22, 2008, DOUGLAS ALAN CORRIHER caused the filing of UCC-1 security notices on each of the Nominee Companies.

89. On or about January 2, 2009, DOUGLAS ALAN CORRIHER sent an email directing J.A. to divide the invoices of CMI and CMI of Iowa among the Nominee Companies.

90. On or about January 16, 2009, DOUGLAS ALAN CORRIHER appointed SHANNON MICHELLE DRAKE as the account executive responsible for the factoring of the receivables for each of the accounts of the Nominee Companies.

91. On or about April 23, 2009, DOUGLAS ALAN CORRIHER presented E.B. with a factoring agreement between I.H.T. of SC,

21

Inc., and SC Bank. At the direction of DOUGLAS ALAN CORRIHER and B.G.H., E.B. executed the factoring agreement.

92. From in or around January 2009, continuing up to and including in or around September 2010, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE administered factoring agreements and factoring lines of credit for each of the Nominee Companies and I.H.T. of SC, Inc.

93. On or about January 16, 2009, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE caused SC Bank to advance $3,281,362.60 by bank-wire transfer to a company hereafter referred to as Funding Company of High Point, North Carolina, a funding company, for the purpose of purchasing CMI and CMI of Iowa invoices from Funding Company.

94. From on or about February 17, 2009, continuing up to and including on or about September 22, 2010, DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST caused the following factoring advances on the factoring lines of credit of the Nominee Companies to be wire transferred to Global Labor for the benefit of B.G.H. and under the pretense that such advances were being made on invoices of the Nominee Companies and I.H.T. of SC, Inc.:

22

|     | DATE<br>(on or about) | AMOUNT |
|-----|------------------------|--------------|
| a)  | February 17, 2009      | $125,000.00  |
| b)  | March 2, 2009          | $130,000.00  |
| c)  | April 8, 2009          | $400,000.00  |
| d)  | May 28, 2009           | $355,000.00  |
| e)  | September 8, 2009      | $275,000.00  |
| f)  | October 5, 2009        | $275,000.00  |
| g)  | October 29, 2009       | $477,000.00  |
| h)  | December 10, 2009      | $449,000.00  |
| i)  | February 25, 2010      | $270,000.00  |
| j)  | June 2, 2010           | $ 65,500.00  |
| k)  | July 28, 2010          | $ 35,000.00  |
| l)  | September 22, 2010     | $ 10,000.00  |

95. From in or about January 2009, continuing up to and including in or about September 2010, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE did sign documents "[SC Bank] Domestic Outgoing Wire Form, Request for Wire Transfer," apportioning factoring advances among the Nominee Companies as set out in the table below:

|     | DATE<br>(on or about) | TOTAL<br>AMOUNT OF<br>ADVANCE | NOMINEE COMPANY (APPORTIONMENT<br>OF TOTAL AMOUNT OF ADVANCE) |
|-----|-----------|--------------|--------------------------------------------------------------|
| a)  | 4/08/2009 | $400,000.00  | Medaloni of SC, Inc. ($20,000.00); NC Global Investments, Inc. ($380,000.00) |
| b)  | 5/28/2009 | $355,000.00  | Medaloni of SC, Inc. ($9,500.00); Brooks Labor, Inc. ($40,800.00); Medaloni, Inc. ($7,700.00); Green Ideas N Motion Corporation ($57,500.00); NC Global Investments, Inc. ($239,500.00) |

| c) | 9/8/2009 | $275,000.00 | Medaloni of SC, Inc. ($5,536.30); Brooks Labor, Inc. ($76,000.00); Medaloni, Inc.($25,000.00); Green Ideas N Motion Corporation ($36,000.00); NC Global Investments, Inc. ($176,000.00 advance per $132,463.70 to NC Global Investments, Inc. $43,536.30 to I.H.T. of SC, Inc. DDA 17285) |
|---|---|---|---|
| d) | 6/2/2010 | $ 65,500.00 | Medaloni of SC, Inc. ($33,500.00); Brooks Labor, Inc. ($32,000.00) |

96. From in or about July 2008, continuing up to and including in or about September 2010, B.G.H. travelled on a regular basis to the offices of SC Bank by airplane to meet with DOUGLAS ALAN CORRIHER and RONALD KEITH EARNEST, as to his business with SC Bank.

97. From in or about January 2009, continuing up to and including in or about May 2009, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE travelled to the offices of CMI in Greensboro, North Carolina, in the Middle District of North Carolina, to meet with B.G.H. and J.A., the controller of the Staffing Companies.

98. From on or about March 31, 2009, continuing up to and including on or about May 11, 2009, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE caused SC Bank to send instructions to the clients of CMI and CMI of Iowa to send payments on CMI and CMI of

24

Iowa invoices to a lockbox controlled by SC Bank with payments addressed to "CMI c/o [SC Bank]."

99. From on or about January 16, 2009, continuing up to and including on or about September 30, 2010, as checks made payable to the Staffing Companies arrived in the lockbox, SHANNON MICHELLE DRAKE caused each check to be applied to the factoring accounts of the Nominee Companies for the purpose of falsely making it appear on the books and records of SC Bank that SC Bank was factoring the invoices of the Nominee Companies.

100. From in or about January 2009, to in or about December 2010, DOUGLAS ALAN CORRIHER and RONALD KEITH EARNEST caused SC Bank to advance monies from the factoring accounts of two of the Nominee Companies to make payments on personal loans and loans personally guaranteed by B.G.H.

101. On or about September 24, 2010, DOUGLAS ALAN CORRIHER and RONALD KEITH EARNEST transferred the amount of $137,712.22 to nominee company Brooks Labor, then knowing it to be controlled by B.G.H.

All in violation of Title 18, United States Code, Section 371.

COUNT TWO

1.    The Grand Jury re-alleges and incorporates by reference paragraphs one through seventy of Count One as if fully set forth herein.

2.    From on or about July 1, 2008, continuing up to and including in or about September 2010, the exact date to the Grand Jurors unknown, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, B.G.H., and divers other persons, both known and unknown to the Grand Jurors, did knowingly execute and attempt to execute a scheme and artifice to obtain money, funds, and property under the custody and control of a financial institution, that is, SC Bank, the deposits of which were insured by the FDIC, by means of materially false and fraudulent pretenses, representations, and promises by causing SC Bank to enter into factoring agreements with the Nominee Companies under the materially false pretenses that these companies were staffing companies with invoices and receivables from the provision of staffing services when, in fact, such companies had no actual staffing business and were controlled by B.G.H.

3.    It was a part of the scheme that DOUGLAS ALAN CORRIHER and RONALD KEITH EARNEST would and did prepare factoring agreements between SC Bank and the Nominee Companies under the pretense that

26

SC Bank would factor the receivables of the Nominee Companies when, in fact, SC Bank would be factoring the receivables of the Staffing Companies.

4. It was a further part of the scheme that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST would and did operate six factoring lines of credit in the names of the Nominee Companies and I.H.T. of SC, Inc., for the purpose of making it appear that SC Bank was factoring the invoices and receivables of the Nominee Companies and I.H.T of SC, Inc.

5. It was a further part of the scheme that B.G.H., or others under his direction and control, would and did contact DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE to request factoring advances on the invoices of the Staffing Companies under the pretense that such factoring advances were being made on the invoices of the Nominee Companies.

6. It was a further part of the scheme that SHANNON MICHELLE DRAKE, in response to requests for factoring advances, would and did create false and fraudulent advance requests and wire transfer requests in the names of the Nominee Companies for the purpose of allowing monies in the control and custody of SC Bank to be advanced under the false pretense that they were factoring advances on the invoices of the Nominee Companies.

27

7. It was a further part of the scheme that DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST would and did cause monies under the control and custody of SC Bank to be wire transferred to Global Labor under the pretense that the advances were factoring advances on the invoices of the Nominee Companies.

8. It was a further part of the scheme that SHANNON MICHELLE DRAKE would and did cause the checks payable to the Staffing Companies to be credited to the accounts of the Nominee Companies.

9. It was a further part of the scheme that DOUGLAS ALAN CORRIHER did cause monies under the control and custody of SC Bank to be transferred by wire transfer to nominee company Brooks Labor knowing that such nominee company was controlled by B.G.H.

10. On or about July 29, 2008, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER, RONALD KEITH EARNEST, B.G.H., and divers other persons, both known and unknown to the Grand Jurors, did knowingly execute and attempt to execute a scheme and artifice to obtain money, funds, and property under the custody and control of a financial institution, that is, SC Bank, the deposits of which were insured by the FDIC, by means of materially false and fraudulent pretenses, representations, and promises, by providing

28

the purported owners of Nominee Companies with factoring agreements between SC Bank and each of the Nominee Companies to factor invoices from staffing customers and directing the purported owners of the Nominee Companies to execute such factoring agreements, when, in fact, as DOUGLAS ALAN CORRIHER then well knew, B.G.H. controlled each of the Nominee Companies, the Nominee Companies had no actual staffing clients or receivables, and monies advanced from SC Bank would be based on the staffing invoices of CMI.

All in violation of Title 18, United States Code, Sections 1344(2) and 2.

COUNT THREE

1. The Grand Jury re-alleges and incorporates by reference paragraphs one through seventy of Count One and paragraphs two through ten of Count Two as if fully set forth herein.

2. On or about January 2, 2009, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, B.G.H., and divers other persons, both known and unknown to the Grand Jurors, did knowingly execute and attempt to execute a scheme and artifice to obtain money, funds, and property under the custody and control of a financial institution, that is, SC Bank, the deposits of which were insured by the FDIC, by means of materially

false and fraudulent pretenses, representations, and promises, by directing by email communication that the controller of CMI and CMI of Iowa, whose initials are J.A., apportion the actual clients of CMI and CMI of Iowa to the Nominee Companies for the purpose of advancing money to B.G.H. under the pretense that SC Bank was factoring the receivables of the Nominee Companies, when, in fact, as DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST then well knew, the invoices being factored belonged to CMI and CMI of Iowa and that SC Bank was advancing monies for the benefit of B.G.H. beyond lending limits imposed on SC Bank.

All in violation of Title 18, United States Code, Sections 1344(2) and 2.

COUNTS FOUR THROUGH FIFTEEN

1.   The Grand Jury re-alleges and incorporates by reference paragraphs one through seventy of Count One and paragraphs two through ten of Count Two as if fully set forth herein.

2.   On or about the dates listed below, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, RONALD KEITH EARNEST, B.G.H., and divers other persons, both known and unknown to the grand jurors, did knowingly execute and attempt to execute a scheme and artifice to obtain money, funds, and property under the custody and control of a financial institution, that is, SC

30

Bank, the deposits of which were insured by the FDIC, by means of materially false and fraudulent pretenses, representations, and promises, by causing the following factoring advances to be sent by wire transfer from SC Bank in Greenville, South Carolina, to the bank account of Global Labor at Bank of America in Greensboro, Guilford County, North Carolina, in the Middle District of North Carolina, under the pretense that such funds were factoring advances against the invoices for staffing services of the Nominee Companies and I.H.T. of SC, Inc., when, in fact, as DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST then well knew, the factoring advances were made on invoices of the Staffing Companies, for the benefit of B.G.H.:

| COUNT | DATE (on or about) | AMOUNT OF ADVANCE |
|---|---|---|
| FOUR | February 17, 2009 | $125,000.00 |
| FIVE | March 2, 2009 | $130,000.00 |
| SIX | April 8, 2009 | $400,000.00 |
| SEVEN | May 28, 2009 | $355,000.00 |
| EIGHT | September 8, 2009 | $275,000.00 |
| NINE | October 5, 2009 | $275,000.00 |
| TEN | October 29, 2009 | $477,000.00 |
| ELEVEN | December 10, 2009 | $449,000.00 |
| TWELVE | February 25, 2010 | $270,000.00 |
| THIRTEEN | June 2, 2010 | $ 65,500.00 |
| FOURTEEN | July 28, 2010 | $ 35,000.00 |
| FIFTEEN | September 22, 2010 | $ 10,000.00 |

All in violation of Title 18, United States Code, Sections 1344(2) and 2.

Case 1:16-cr-00205-NCT   Document 20   Filed 11/29/16   Page 31 of 46

## COUNT SIXTEEN

1.    The Grand Jury re-alleges and incorporates by reference paragraphs one through seventy of Count One and paragraphs two through ten of Count Two as if fully set forth herein.

2.    On or about September 24, 2010, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER, B.G.H., and divers other persons, both known and unknown to the Grand Jurors, did knowingly execute and attempt to execute a scheme and artifice to obtain money, funds, and property under the custody and control of a financial institution, that is, SC Bank, the deposits of which were then insured by the FDIC, by means of materially false and fraudulent pretenses, representations, and promises, by causing the amount of $137,712.22 of monies under the custody and control of SC Bank to be sent by wire transfer from SC Bank in Greenville, South Carolina, to a bank account in the name of nominee company Brooks Labor at Bank of America in Greensboro, North Carolina, under the pretense that such funds were owed to nominee company Brooks Labor due to the factoring of such nominee companies invoices when in fact, as DOUGLAS ALAN CORRIHER then well knew, all amounts collected by SC Bank were collected on the invoices for the Staffing Companies, and B.G.H. controlled Brooks Labor as a nominee to allow SC Bank to lend amounts in excess of the LLL.

32

All in violation of Title 18, United States Code, Section 1344(2) and 2.

## COUNTS SEVENTEEN THROUGH TWENTY-EIGHT

1.    The Grand Jury re-alleges and incorporates by reference paragraphs one through seventy of Count One and paragraphs two through ten of Count Two as if fully set forth herein.

2.    On or about the following dates and in the following amounts, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, and RONALD KEITH EARNEST, then being employees of SC Bank, that is, bank employees, with intent to defraud, did on one or more occasions knowingly embezzle, abstract, purloin, and willfully misapply monies, funds, and credits as set forth below by date and count, belonging to and entrusted to the care of SC Bank, the deposits of which were then insured by the FDIC:

| COUNT | DATE (on or about) | AMOUNT |
|-------|--------------------|--------|
| SEVENTEEN | February 17, 2009 | $125,000.00 |
| EIGHTEEN | March 2, 2009 | $130,000.00 |
| NINETEEN | April 8, 2009 | $400,000.00 |
| TWENTY | May 28, 2009 | $355,000.00 |
| TWENTY-ONE | September 8, 2009 | $275,000.00 |
| TWENTY-TWO | October 5, 2009 | $275,000.00 |
| TWENTY-THREE | October 29, 2009 | $477,000.00 |
| TWENTY-FOUR | December 10, 2009 | $449,000.00 |
| TWENTY-FIVE | February 25, 2010 | $270,000.00 |
| TWENTY-SIX | June 2, 2010 | $ 65,500.00 |
| TWENTY-SEVEN | July 28, 2010 | $ 35,000.00 |
| TWENTY-EIGHT | September 22, 2010 | $ 10,000.00 |

33

All in violation of Title 18, United States Code, Sections 656 and 2.

## COUNT TWENTY-NINE

1.    The Grand Jury re-alleges and incorporates by reference paragraphs one through seventy of Count One and paragraphs two through ten of Count Two as if fully set forth herein.

2.    On or about September 24, 2010, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER, then being an employee of SC Bank, with the intent to defraud, did knowingly embezzle, abstract, purloin, and willfully misapply monies, funds, and credits, that being $137,712.22 belonging to and entrusted to the care of SC Bank, the deposits of which were then insured by the FDIC; in violation of Title 18, United States Code, Sections 656 and 2.

## COUNT THIRTY

1.    The Grand Jury re-alleges and incorporates by reference paragraphs one through seventy of Count One and paragraphs two through eight and ten of Count Two as if fully set forth herein.

2.    From on or about July 1, 2008, continuing up to and including on or about September 29, 2010, the exact dates to the Grand Jurors unknown, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER and B.G.H. did unlawfully, voluntarily, intentionally, and

34

knowingly conspire, combine, confederate, and agree together and with other individuals both known and unknown to the Grand Jury to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue: to wit, payroll taxes.

## MANNERS AND MEANS

3.    It was a part of the conspiracy that DOUGLAS ALAN CORRIHER and B.G.H. would and did misappropriate funds for payroll taxes that were due to be paid over to the IRS.

4.    It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER would and did direct funds belonging to the Staffing Companies to accounts under the control of B.G.H. to impede any payroll tax collection action by the IRS.

5.    It was a further part of the conspiracy that B.G.H. would and did refuse to supply the accounting and payroll officers of the Staffing Companies with sufficient funds to pay over payroll taxes to the IRS.

6.    It was a further part of the conspiracy that B.G.H. would and did convert factoring advances proceeds that could be used to pay the payroll taxes to his own personal and business uses.

35

7.    It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER would and did conceal from SC Bank the fact that the payroll taxes of the Staffing Companies were not being paid over to the IRS.

8.    It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER would and did continue to advance monies from SC Bank on the invoices of the Staffing Companies through the nominee lending scheme despite knowing that B.G.H. was converting funds advanced by SC Bank to B.G.H. without paying taxes due to the IRS from B.G.H. and the Staffing Companies.

9.    It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER would and did cause SC Bank to improperly retain monies paid by customers of the Staffing Companies that otherwise would have been available to make payroll tax payments to the IRS.

10.   It was further part of the conspiracy that DOUGLAS ALAN CORRIHER and B.G.H. would and did perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

### OVERT ACTS

11.   The Grand Jury re-alleges and incorporates by reference the overt acts identified in paragraphs eighty-three through ninety-nine of Count One as if set forth fully herein.

12. From on or about July 27, 2009, continuing up to and including on or about July 28, 2009, the exact date to the Grand Jurors unknown, DOUGLAS ALAN CORRIHER caused the submission of false loan memoranda to SC Bank that failed to report unpaid payroll tax debts of the Staffing Companies.

13. On or about the following dates and in the following amounts, DOUGLAS ALAN CORRIHER caused factoring advances against the accounts receivable of the Staffing Companies to be wire transferred to an account in Greensboro, North Carolina under the control of B.G.H.:

|  | DATE<br>(on or about) | AMOUNT |
|---|---|---|
| a) | February 17, 2009 | $125,000.00 |
| b) | March 2, 2009 | $130,000.00 |
| c) | April 8, 2009 | $400,000.00 |
| d) | May 28, 2009 | $355,000.00 |
| e) | September 8, 2009 | $275,000.00 |
| f) | October 5, 2009 | $275,000.00 |
| g) | October 29, 2009 | $477,000.00 |
| h) | December 10, 2009 | $449,000.00 |
| i) | February 25, 2010 | $270,000.00 |
| j) | June 2, 2010 | $ 65,500.00 |
| k) | July 28, 2010 | $ 35,000.00 |
| l) | September 22, 2010 | $ 10,000.00 |

All in violation of Title 18, United States Code, Section 371.

COUNT THIRTY-ONE

1. The Grand Jury re-alleges and incorporates by reference paragraphs one through seventy of Count One and paragraphs two through eight and ten of Count Two as if fully set forth herein.

2. From in or around July of 2008, continuing up to and including in or around September 2010, the exact date to the Grand Jurors unknown, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER did corruptly endeavor to obstruct and impede the due administration of the internal revenue laws of the United States by the following means, among others:

a. causing funds advanced from SC Bank against the invoices of the Staffing Companies to be wire transferred and diverted to accounts under the control of B.G.H. rather than paid to Staffing Company accounts where those funds could be used to make payments of payroll taxes to the IRS; and

b. causing SC Bank to improperly retain a portion of the payments received from customers of the Staffing Companies when those funds could otherwise be used to make payroll tax payments to the IRS.

All in violation of Title 26, United States Code, Section 7212(a) and Title 18, United States Code, Section 2.

38

COUNT THIRTY-TWO

1.    The Grand Jury re-alleges and incorporates by reference paragraphs one through seventy of Count One and paragraphs two through ten of Count Two as if fully set forth herein.

2.    On or about January 16, 2009, SC Bank paid Funding Company approximately $3,281,362.60 for CMI and CMI of Iowa accounts receivable.

3.    By in or around March 2009, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE had become aware that a significant portion of the $3,281,362.60 of the purchased accounts receivable were backed by invoices which had already been factored, funded, and collected by Funding Company and were therefore uncollectible.

4.    Despite knowing that a significant portion of the $3,281,362.60 of the purchased accounts receivable were uncollectible, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE allowed those accounts receivable to remain on SC Bank's books as aging receivables.

5.    Beginning in or around March 2009, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE diverted funds by making factoring advances against current accounts receivables of the accounts of the Nominee Companies to improperly pay off the uncollectible accounts receivable.

39

6.     From in or around March 2009, continuing up to and including in or around September 2010, the exact date to the Grand Jurors unknown, in the County of Guilford, in the Middle District of North Carolina, and elsewhere, DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, B.G.H., and divers other persons, both known and unknown to the Grand Jurors, knowingly and unlawfully combined and agreed together and with other persons to make and cause to be made materially false entries in the books, reports, and statements of SC Bank, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE being officers, agents, and employees of SC Bank, the deposits of which were insured by the FDIC, with the intent to deceive the officers and directors of SC Bank, the FDIC, and BOFI, and the agents and examiners appointed to examine the affairs of SC Bank, by creating false entries showing that the uncollectible and aging invoices had been paid, when, in fact, as DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE then well knew, such aging and unpaid invoices had not been paid by an actual staffing customer, but in fact had been marked paid through application of the proceeds of the CMI checks funded by factoring advances made by SC Bank for that purpose with the cooperation of B.G.H.; in violation of Title 18, United States Code, Section 1005.

40

7. It was a part of the conspiracy that DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE would and did cause wire transfers from SC Bank to Global Labor in Greensboro, North Carolina, in the Middle District of North Carolina, of funds newly advanced to certain Nominee Companies.

8. It was a further part of the conspiracy that Global Labor would and did rapidly transmit the proceeds of such wire transfers to operating accounts of CMI.

9. It was a further part of the conspiracy that CMI, at the direction of B.G.H., would and did use a significant portion of these proceeds to fund the issuance of checks payable to Nominee Companies other than the ones to which the funds were originally advanced.

10. It was a further part of the conspiracy that the aforementioned CMI checks were transported to SC Bank and applied by DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE to pay off a significant portion of the aforementioned $3,281,362.60 of uncollectible receivables being carried by SC Bank as aging invoices over ninety days on the accounts of the Nominee Companies.

11. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE would and did cause entries in the books of SC Bank that falsely represented that the

41

aforementioned uncollectible receivables were paid off with funds received to pay the associated original invoices when, in fact, the funds were the proceeds of new factoring advances made by SC Bank against unrelated invoices.

12. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE would and did conceal from the officers and directors of SC Bank, the FDIC, BOFI, and examiners charged with examining the books and records of SC Bank that DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE in about January 2009 had advanced approximately $3,281,362.60 in SC Bank funds to purchase CMI and CMI of Iowa invoices, many of which had either already been collected by Funding Company or which were false or otherwise uncollectible invoices.

13. It was a further part of the conspiracy that J.A. at the direction of B.G.H., would and did prepare checks which were funded by monies advanced against invoices of the Staffing Companies for the specific purpose of applying to old and unpaid invoices attributed to factoring pools set up by SHANNON MICHELLE DRAKE in the names of Nominee Companies.

14. It was a further part of the conspiracy that, upon receiving the checks made payable to one of the Nominee Companies at the offices of SC Bank, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE would and did direct that the check be stamped

42

"deposit only" and credited against uncollectible, aging, or unpaid invoices of the Nominee Companies at SC Bank despite the fact that the straw officers of the Nominee Companies had never seen the checks, had no knowledge of the issuance of the checks, and had not endorsed the checks.

15. It was a further part of the conspiracy that DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE would and did then apply the funds from the checks on the CMI account to pay down aging and unpaid invoices carried in the accounts of the Nominee Companies, thereby in effect using SC Bank money to pay down debt to SC Bank in a circular manner, to allow both factoring advances to continue to B.G.H. on the invoices of the Staffing Companies and to conceal the aging and unpaid invoices from the officers and directors of SC Bank and from the FDIC, BOFI, and examiners charged with the examination and audit of SC Bank.

OVERT ACTS

16. In furtherance of the conspiracy to effect the objects thereof, DOUGLAS ALAN CORRIHER, SHANNON MICHELLE DRAKE, B.G.H., and divers others, both known and unknown to the Grand Jurors, committed and caused to be committed overt acts in the Middle District of North Carolina and elsewhere, including, but not limited to, the following:

43

17.  On or about April 6, 2009, B.G.H., or others under his direction and control, directed J.A. the controller of CMI to prepare checks drawn on the CMI Bank of America account made payable as follows (collectively, "CMI checks"):

a.  Check #52784 made payable to "Brooks Labor" for $210,709.65;

b.  Check #52785 made payable to "Green Ideas" for $170,242.57;

c.  Check #52786 made payable to "Medaloni, Inc." for $65,447.39; and

d.  Check #52787 made payable to "Medaloni SC" for $68,969.96.

18.  On or about April 8, 2009, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE directed that SC Bank make factoring advances against the invoices of CMI and CMI of Iowa in the amount of $400,000.

19.  On or about April 8, 2009, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE caused a wire transfer to the Bank of America account of Global Labor controlled by B.G.H. with the agreement that B.G.H. would use the money advanced to pay down aging and unpaid invoices.

20.  On or about April 8, 2009, upon receiving the $400,000.00 wire from SC Bank in the Global Labor Bank of America account,

44

B.G.H. directed that Bank of America transfer $400,000.00 from the Global Labor account to the CMI account at Bank of America.

21. On or about April 8, 2009, J.A. provided the CMI checks to B.G.H., or someone working at B.G.H.'s direction, to physically carry the CMI checks to DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE at the offices of SC Bank in Greenville, South Carolina.

22. On or about April 8, 2009, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE directed that the CMI checks were to be stamped "deposit only" and then credited against uncollectible, aging, or unpaid invoices at SC Bank.

23. On or about April 17, 2009, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE made false entries on the books and records of SC Bank marking certain aging and unpaid invoices as paid when, in fact, as DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE then well knew, such aging and unpaid invoices had not been paid by a staffing customer and in fact had been marked paid through application of the CMI checks funded by factoring advances made by SC Bank for that purpose with the cooperation of B.G.H.

24. From or about April 2009, continuing to and including on or about September 2010, the exact date to the grand jurors unknown, DOUGLAS ALAN CORRIHER and SHANNON MICHELLE DRAKE made additional factoring advances to Global Labor with the agreement of B.G.H. that such funds would be paid to SC Bank by CMI checks

45

made payable to Nominee Companies for the purpose of making false entries on the books and records of SC Bank that aging and unpaid invoices had been paid when, in fact, they had not been paid by any staffing customer or client.

All in violation of Title 18, United States Code, Section 371.

A TRUE BILL:

_____
FRANK J. CHUT, JR.
ASSISTANT UNITED STATES ATTORNEY

_____
NATHAN P. BROOKS
TRIAL ATTORNEY
DEPARTMENT OF JUSTICE, TAX DIVISION

_____
JEFFREY A. McLELLAN
TRIAL ATTORNEY
DEPARTMENT OF JUSTICE, TAX DIVISION

_____
SANDRA J. HAIRSTON
ATTORNEY FOR THE UNITED STATES
(Acting under authority conferred
by 28 U.S.C. § 515)

46